Learned, P. J.
—When this case was before this court the first time we were of the opinion that a non-suit should not have been granted and that the case should have gone to the jury 3 N Y. State Rep., 731. The evidence on the plaintiff’s part seems to be substantially the same now that it was on the first trial. There was no evidence at that time that the gates were out of repair." How it appears that one of the four poles which constitute the gates was broken. It was the one by the shanty which was on the east side of the track. The deceased was approaching from the west. One witness for defendant testifies that they could lower the gates on the west side; but “they wouldn’t allow you to work the other three. They were chained up.” The gate was broken Saturday evening and the accident occurred Monday evening. There is no reason to suppose that the deceased knew that the gates were out of order, and, therefore, the fact that the gates were out of order, not shown to have come to the knowledge of deceased leaves the effect of the open gates the same as it was considered to be on the former argument. See Glushing v. Sharp, 96 N. Y., 676.
As was said in East. R. W. Co. v. Wanless (Law Rep., 7 H. of L., 12): “The circumstance that the gates at this *838 level crossing were open at this particular time amounted to a statement and notice to the public that the line at that time, was safe for crossing.”
The accident happened where Second avenue, running east and west, crossed the railroad tracks running north and south. There were three tracks, the most easterly the up track, the next the down track, the most westerly the switch track, on which the engine was backing southward. The deceased was in a charcoal wagon, with a pair of horses, driving eastward. The wagon was struck at its forward part and the horses were uninjured. The tracks are five feet two; from the east to the next is seven feet one; from that next to the switch track eight feet eight; from the switch track to the nearest side of the bridge about fifty-five feet.
The accident happened about nine p. m., and both the direct testimony and the indirect evidence show that the night was dark. There was a flagman, Michael Ryan, whose duty it was to flag persons crossing as well as to flag the trains. He came out of the shanty, which is on the east side of the railroad and south side of the highway, with a white lamp. This indicated to the engineer that it was all right and to go ahead. As he came out he saw the engine; and when he reached the middle or down track he saw something which proved to be the team and wagon of deceased about upon the bridge. He hallooed “stay back,” and stepped over on the switch track. He could see the white horse and then the other horse, but not the wagon. He continued to halloo four or five times, and then the engine was crossing and he stepped back to get out of its way. And when he stepped back he saw the charcoal wagon. He says that he was afraid that he would be knocked down by the engine if he ran across and stopped the horses. And he says he had stepped over on the switch track and stepped back to avoid the engine; it is not clear why he could not have avoided the engine by stepping forward and stopping the horses.
Burns, however, says that at the time of the accident the flagman was on the easterly track near the middle of the street. And Burns himself, who stood near the shanty, about thirty feet from the place of the accident, could not see anything but the grey horse until after the accident. Gilbert Hardin, the fireman was on the engine, and on the west side of the engine facing south and looking the way the engine was going. He was on the lookout to see if there was anything on the track. He saw nothing till the engine was almost on the crossing; then he saw a light horse, and as he saw it there was a crash. He thought it was a runaway team, so that he couldn’t have seen the *839 wagon even when the crash came. The engineer, Daniels, was on the north side, and he did not see the team; but he saw the light on the track. And that, as the flagman testified, was a signal to him to come on, that the road was clear. And no signal to stop was given him up to the time of the accident.
Since, then, the fireman and the engineer could not see the team and wagon of deceased, it would not be strange if the deceased could not have seen the engine. Evidently the night was dark, and the possibility of looking some distance up the track in daylight does not show what could be seen on such a night. It may be said that the light on the rear of the tender might be seen. But it appears that the engine was running light without steam, and hence was not making the usual noise. And the light on the ■engine might seem merely like the light in the hand of a flagman, if it could have been seen.
Furthermore, it appears by the testimony of Hardin that the lamp on the rear of the engine threw its light right ■down the track. He says: “When the horses struck that ray I hallooed, and as I hallooed, it happened,” that is, the accident. Thus, it appears, that this lamp on the engine did not send fight in every direction, but only straight down the track. For it was not until the horses came actually in the fine of the fight, that is, on the track, that the fireman saw them. And even then he did not see the wagon. Hence, there is no reason to suppose that the back fight on the rear of the engine (or tender) could be seen by the deceased as he approached the crossing. And whether there was anything to obstruct his vision is of little consequence, if the night was so dark that the engine could not be seen. When it appears that the fireman who was on the lookout upon the west side of the engine could not see the approaching team until their heads were on the track, and even then could not see the wagon, it is a reasonable inference that the deceased could not have seen the engine, nor even the back fight on it. The fine of its fight did not extend outside of the track. We must take all the circumstances together in order to judge of the conduct of the deceased. The gates were open, which fact was an indication that the crossing was safe. The night was so dark that he probably could not see the engine. He was riding in a charcoal wagon, a very noisy vehicle, and the call of the flagman might easily fail to be heard. A fight was on the track, but it gave no signal of danger. It was no more a notice to stop than a notice to go on. The engine was using no steam, and was running perhaps six miles an hour. Whether there was a bell rung or whistle sounded was in doubt, and the jury have *840 decided that. In this connection we may speak of the testimony of Creed. Of course, it is open to criticism. He was a convict, and his testimony was taken in the state prison. Witnesses were produced by the defendant, whose testimony is claimed to be in contradiction to his, and Creed’s own testimony is claimed to be in conflict with that given on a former trial. But the Code has made convicts competent witnesses. Section 882. And hence the weight that is to be given to Creed’s testimony and to the opposing testimony is a matter for the jury. Employees of the railroad company in such cases as this, when the accident has or may have arisen through act of theirs, are under great inducements to give a version favorable to the defendant. Yet their testimony must be taken and considered by the jury.
The distance to which sounds may be heard is very uncertain. Currents of wind and dampness of the atmosphere affect this greatly. Other sounds also disturb the hearing, so that we cannot assume that the deceased heard, still less, understood, the shouting of the flagman and -others.
It seems to us, therefore, that it was not error to refuse a non-suit. Nor can we say that the verdict was against or contrary to the weight of evidence. As has been ■ said by the court of appeals, “Inferences drawn from the appearance and manner of testifying of witnesses might turn the scale toward the fact testified to.” Of course there is no other balancing of evidence than by observing the effect it produces upon the mind. Evidence may be so strong on one side that it is safe to say that a verdict the other way must have been the result of ignorance or prejudice. Short of that, if a court sets aside a verdict it takes the place of the jury in violation of the constitution.
The defendant says it was error to refuse to charge the jury that if they disbelieved and disregarded the evidence of Creed they should find for the defendant. The ruling is justified by Chapman v. Erie R. W. Co. (55 N. Y., 579, at 587).
And it has tended to uncertainty in the law that courts, for the purpose of setting aside verdicts which did not please them, have labored to find or invent some trifling error of law.
The defendant claims that the court erred in saying that he would not charge that the ringing of the bell and the light on the engine was, as a matter of law, the full measure of defendant’s duty under the circumstances. That ruling was proper under Byrne v. N. Y. C. and H. R. R. Co. (104 N. Y., 362; 5 N. Y. State Rep., 722), and the Barry Case there cited.
*841 The circumstances of this present case were peculiar in the fact that the gates which had ordinarily given signal of danger now stood open. The fact that the statutory signals were given does not relieve the defendant from the duty of using due care. If a flagman should beckon travelers to come across the track, the ringing of the bell on the engine would hardly be the full measure of the duty of the company.
We think the judgment and order should be affirmed, with costs.
Landon and Williams, JJ., concur.